UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | |
|---|---|
| Anthony Hulsizer and<br>Rhonda Bianco-Hulsizer,<br><br>    Plaintiffs,<br><br>v.<br><br>Magline, Inc. and<br>Magline International, LLC,<br><br>    Defendants. | Civil Action No.: 4:17-cv-00415-RBH<br><br><br><br><br>**ORDER** |

This products liability action involves design defect and warning defect claims. Defendants have filed a motion for summary judgment. *See* ECF No. 28. The Court grants in part and denies in part the motion for the reasons herein.[1]

## **Background**[2]

The product at issue is the Magliner CooLift delivery system ("the CooLift"), which consists of a battery-powered pallet jack and high-density plastic pallets.[3] On October 13, 2014, Plaintiff

---

[1] Pursuant to Local Civil Rule 7.08 (D.S.C.), the Court does not find a hearing necessary on the summary judgment motion.

[2] In their response in opposition to Defendants' summary judgment motion, Plaintiffs state they "agree[] for the most part with the recitation of the facts given by Defendants in their memorandum," with the exception of Defendants' discussion of the risk-utility test and Plaintiffs' expert Dr. Bryan Durig. ECF No. 29 at p. 1. Accordingly, except for Defendants' argument regarding Dr. Durig's alleged failure to conduct a risk-utility analysis, the Court adopts the factual summary in Defendants' memorandum without fully repeating it here. *See* ECF No. 28-1 at pp. 2–8.

[3] Although the allegations in Plaintiffs' complaint focus on the pallet jack rather than the pallets, both Defendants and Plaintiffs treat the jack and the pallets as complementary components "used in conjunction" with one another as part of the "CooLift delivery *system*." ECF No. 28-1 at p. 3 (emphasis added). Additionally, the CooLift Owner's Manual addresses both the jack and the pallets and indicates the jack is used exclusively with CooLift pallets. *See* ECF No. 28-6 at p. 4 ("Do not utilize the Magliner CooLift as a lifting device for anything other than a CooLift pallet."). Accordingly, based on the parties' representations and the evidence before it, the Court will treat the CooLift delivery system (i.e., consisting of both the jack and the pallets) as the product at issue.

Anthony Hulsizer—a truck driver for the Pepsi Bottling plant in Conway, South Carolina—was making beverage deliveries using the CooLift. During one stop, while Mr. Hulsizer was moving pallets in the back of his truck, the jack became stuck underneath a pallet. He attempted to slide the jack out by pushing on it, tilting it forward, and then pulling on it. In doing so, Mr. Hulsizer injured his back.

On January 10, 2017, Mr. Hulsizer and his wife (Rhonda Bianco-Hulsizer) (collectively, "Plaintiffs") filed this products liability action in state court against Defendants Magline Inc. and Magline International, LLC ("Defendants" or "Magline") asserting five causes of action: negligence/gross negligence, strict liability, breach of warranties, amalgamation of interests,[4] and loss of consortium. *See* ECF No. 1-1. Plaintiffs alleged the jack "had an unsafe tendency to get stuck in the pallets it was carrying, which resulted in [Mr. Hulsizer] having to twist and pull the machine to get it out from under the pallets. This pulling, lifting, and twisting was the proximate cause of the injury to his back." Complaint at ¶ 4. Plaintiffs alleged Defendants "designed, manufactured, and sold" the CooLift. *Id.*

On February 9, 2017, Defendants removed the action to this Court based on diversity jurisdiction pursuant to 28 U.S.C. § 1332, and they answered and subsequently filed a motion for summary judgment. *See* ECF Nos. 1, 3, & 28. Plaintiffs filed a response in opposition, and Defendants filed a reply. *See* ECF Nos. 29 & 31.

**Legal Standard**

Summary judgment is appropriate when no genuine issue of material fact exists and the moving

---

[4] "Amalgamation of interests" is a single business enterprise theory. The South Carolina Supreme Court formally recognized this theory earlier this year, explaining that "under this theory, . . . where multiple corporations have unified their business operations and resources to achieve a common business purpose and where adherence to the fiction of separate corporate identities would defeat justice, courts have refused to recognize the corporations' separateness, instead regarding them as a single enterprise-in-fact, to the extent the specific facts of a particular situation warrant." *Pertuis v. Front Roe Restaurants, Inc.*, 817 S.E.2d 273, 279 (S.C. 2018).

party is entitled to judgment as a matter of law. *Reyazuddin v. Montgomery Cty., Md.*, 789 F.3d 407, 413 (4th Cir. 2015); *see* Fed. R. Civ. P. 56(a) ("The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record . . . ; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). The facts and inferences to be drawn from the evidence must be viewed in the light most favorable to the non-moving party, *Reyazuddin*, 789 F.3d at 413, but the Court "cannot weigh the evidence or make credibility determinations." *Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 569 (4th Cir. 2015).

Moreover, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). "A dispute of material fact is 'genuine' if sufficient evidence favoring the non-moving party exists for the trier of fact to return a verdict for that party." *Seastrunk v. United States*, 25 F. Supp. 3d 812, 814 (D.S.C. 2014). A fact is "material" if proof of its existence or nonexistence would affect disposition of the case under the applicable law. *Anderson*, 477 U.S. at 248.

At the summary judgment stage, "the moving party must demonstrate the absence of a genuine issue of material fact. Once the moving party has met his burden, the nonmoving party must come forward with some evidence beyond the mere allegations contained in the pleadings to show that there is a genuine issue for trial." *Baber v. Hosp. Corp. of Am.*, 977 F.2d 872, 874–75 (4th Cir. 1992) (internal citation omitted). Summary judgment is not warranted unless, "from the totality of the

evidence, including pleadings, depositions, answers to interrogatories, and affidavits, the [C]ourt believes no genuine issue of material fact exists for trial and the moving party is entitled to judgment as a matter of law." *Whiteman v. Chesapeake Appalachia, L.L.C.*, 729 F.3d 381, 385 (4th Cir. 2013); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).

## Discussion

The South Carolina Supreme Court has explained:

> [T]here are three defects a plaintiff in a products liability lawsuit can allege: 1) a manufacturing defect, 2) a warning defect, and 3) a design defect. When a manufacturing defect claim is made, a plaintiff alleges that a particular product was defectively manufactured. When a warning defect claim is made, a plaintiff alleges that he was not adequately warned of dangers inherent to a product. When a design defect claim is made, a plaintiff alleges that the product at issue was defectively designed, thus causing an entire line of products to be unreasonably dangerous.

*Watson v. Ford Motor Co.*, 699 S.E.2d 169, 174 (S.C. 2010). In this case, Plaintiffs are pursuing a **design defect** claim and a **warning defect** claim against Defendants,[5] and they bring these claims under theories of strict liability, negligence, and breach of warranty, as permitted by South Carolina law.[6] *See generally Rife v. Hitachi Const. Mach. Co.*, 609 S.E.2d 565, 568 (S.C. Ct. App. 2005) ("A products liability case may be brought under several theories, including negligence, strict liability, and warranty.").

Regardless of the theory on which they seek recovery, Plaintiffs must prove the following three elements: (1) Mr. Hulsizer was injured by the CooLift; (2) the CooLift, at the time of the accident, was

---

[5] Plaintiffs indicate in their response in opposition that they are ***not*** pursuing a **manufacturing defect** claim. *See* ECF No. 29 at pp. 3–4.

[6] South Carolina substantive law governs this diversity action. *See generally Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 427 (1996) ("Under the *Erie* doctrine, federal courts sitting in diversity apply state substantive law and federal procedural law.").

4

in essentially the same condition as when it left the hands of Defendants; and (3) the injury occurred because the CooLift was in a defective condition unreasonably dangerous to the user. *See Branham v. Ford Motor Co.*, 701 S.E.2d 5, 8 (S.C. 2010) (citing *Madden v. Cox*, 328 S.E.2d 108, 112 (S.C. Ct. App. 1985)). Defendants' motion for summary judgment is based on the third element, as they argue Plaintiffs have not presented any evidence showing the CooLift was in a defective condition that was unreasonably dangerous to the user. *See* ECF No. 28.

**I.    Design Defect Claim**

**A.    Strict Liability and Warranty Theories**

"In an action based on strict tort *or* warranty, [a] plaintiff's case is complete when he has proved the product, as designed, was in a defective condition unreasonably dangerous to the user when it left the control of the defendant, and the defect caused his injuries." *Madden*, 328 S.E.2d at 112 (emphasis added); *see also* S.C. Code Ann. § 15–73–10 (South Carolina's strict liability statute); *id.* § 36–2–313 (express warranty); *id.* § 36–2–314 (implied warranty of merchantability); *id.* § 36–2–315 (implied warranty of fitness for a particular purpose). "The focus here is on the condition of the product, without regard to the action of the seller or manufacturer." *Bragg v. Hi-Ranger, Inc.*, 462 S.E.2d 321, 326 (S.C. Ct. App. 1995). In this case, Plaintiffs allege the CooLift was defectively designed because the jack "had an unsafe tendency to get stuck in the pallets it was carrying." Compl. at ¶ 4.

Defendants argue Plaintiffs' design defect claim fails because they have not provided a reasonable alternative design for the CooLift jack or the pallets it carries. ECF No. 28-1 at pp. 12–19. They contend Plaintiffs' retained expert, Dr. Bryan Durig, has not offered an opinion that satisfies South Carolina's risk-utility test with its requirement of showing a feasible alternative design to prove a design defect. *Id.* at p. 14.

5

### 1. Applicable Law

In South Carolina, "the exclusive test in a products liability design case is the risk-utility test with its requirement of showing a feasible alternative design." *Branham*, 701 S.E.2d at 14.[7] The risk-utility test states "a product is unreasonably dangerous and defective if the danger associated with the use of the product outweighs the utility of the product," *Bragg*, 462 S.E.2d at 328, and it requires a plaintiff to present evidence of a reasonable alternative design, which includes consideration of the (1) costs, (2) safety, and (3) functionality associated with the alternative design. *Branham*, 701 S.E.2d at 16 ("The plaintiff will be required to point to a design flaw in the product and show how his alternative design would have prevented the product from being unreasonably dangerous."). A risk-utility "analysis asks the trier of fact to determine whether the potential increased price of the product (if any), the potential decrease in the functioning (or utility) of the product (if any), and the potential increase in other safety concerns (if any) associated with the proffered alternative design are worth the benefits that will inhere in the proposed alternative design." *Id.* at 16 n.16.

"It is well-established that one cannot draw an inference of a defect from the mere fact a product failed. Accordingly, the plaintiff must offer some evidence beyond the product's failure itself to prove that it is unreasonably dangerous." *Graves v. CAS Med. Sys., Inc.*, 735 S.E.2d 650, 658–59 (S.C. 2012) (internal citation omitted). "In some design defect cases, expert testimony is required to make this showing [of a design flaw and a feasible alternative design] because the claims are too complex to be within the ken of the ordinary lay juror." *Id.* at 659. Thus, "[i]n most design defect cases, plaintiffs

---

[7] In holding the risk-utility test is the exclusive test in a products liability design case, the South Carolina Supreme Court adhered to its "longstanding approval of the principle that a product is not in a defective condition unreasonably dangerous merely because it 'can be made more safe.'" *Branham*, 701 S.E.2d at 16 (quoting *Marchant v. Mitchell Distrib. Co.*, 240 S.E.2d 511, 513 (S.C. 1977)).

offer expert testimony as evidence to establish their claim." *Watson*, 699 S.E.2d at 174.

To survive summary judgment on a design defect claim, a plaintiff must demonstrate that a feasible alternative design exists for the product at issue. *Holst v. KCI Konecranes Int'l Corp.*, 699 S.E.2d 715, 719 (S.C. Ct. App. 2010) (citing *Disher v. Synthes (U.S.A.)*, 371 F. Supp. 2d 764, 771 (D.S.C. 2005)). "In determining whether an alternative design is practical or feasible, courts will look to see whether a risk-utility analysis has been conducted to weigh the benefits of any new design against the costs and potentially adverse consequences of the design." *Id.* Thus, at the summary judgment stage, the district court must determine whether there is evidence tending to create genuine issues of material fact on each of the factors (safety, costs, and functionality) relevant to the risk-utility analysis and its required showing of an alternative feasible design, in accordance with *Branham*. *See Holland ex rel. Knox v. Morbark, Inc.*, 754 S.E.2d 714, 720 (S.C. Ct. App. 2014); *Quinton v. Toyota Motor Corp.*, No. 1:10-cv-02187-JMC, 2013 WL 1680555, at *4 (D.S.C. Apr. 17, 2013). "Whether this evidence satisfies the risk-utility test is ultimately a jury question." *Branham*, 701 S.E.2d at 13–14.

### 2. Analysis

Viewing the facts and inferences in the light most favorable to Plaintiffs, the Court finds a genuine issue of material fact exists as to whether the CooLift was unreasonably dangerous as the result of a design defect in the jack and/or pallets and whether an alternative feasible design exists.

Initially, the Court notes Defendants' arguments center on the risk-utility test and the alleged shortcomings in Dr. Durig's opinion. Their arguments suggest Dr. Durig's opinion (i.e., his expert report and deposition testimony) should be the exclusive consideration as to whether Plaintiffs have

made a sufficient showing regarding the risk-utility analysis at this stage in the litigation.[8] However, while expert testimony is often required for a plaintiff to satisfy the risk-utility test, *see Graves*, 735 S.E.2d at 659, the Court's duty at the summary judgment stage is to consider *all* the evidence before it (not just Dr. Durig's opinion) and determine whether any question of fact exists regarding the risk-utility test. *See Whiteman*, 729 F.3d at 385 (specifying a court deciding a summary judgment motion must consider "the totality of the evidence"). If so, it "is ultimately a jury question" regarding "[w]hether this evidence satisfies the risk-utility test." *Branham*, 701 S.E.2d at 13–14; *id.* at 16 n.16 (noting the risk-utility "analysis ***asks the trier of fact*** to determine" the costs, safety, and functionality "that will inhere in the proposed alternative design" (emphasis added)). With this legal standard in mind, the Court will discuss the evidence before it.

Here, Plaintiffs have submitted evidence from various sources bearing on the risk-utility analysis. Of course, their primary source is the expert opinion of Dr. Durig, a mechanical engineer who examined several CooLift pallet jacks and pallets and made the following conclusions:

- **In his expert report**, Dr. Durig determined the lack of clearance between the top of the jack platform and the underside of the pallets was the reason that Mr. Hulsizer had to lift the jack in order to slide it from underneath the pallet. *See* Durig Expert Report at pp. 3–4. He further concluded two alternative designs—one for the jack and one for the pallet—are available that would increase the clearance: **(1)** the height of the jack platform could be lowered; or **(2)** the underside of the pallet could be raised. *Id.* at p. 4. He opined neither alternative design would alter the functionality of the jack or the pallets. *Id.*

- **At his deposition**, Dr. Durig testified the issue with the CooLift "comes down to . . . a clearance issue[—]there's inadequate clearance to allow any type of wear on the legs [of the pallets] that result in the pallets potentially getting stuck" on the

---

[8] *See, e.g.*, ECF No. 28-1 at p. 18 ("The testimony offered by Dr. Durig is not sufficient to prove that the CooLift pallet jack and pallets were defective and unreasonably dangerous. *He did not conduct a risk-utility analysis regarding any proposed design alternative.*" (emphasis added)). Again, Defendants' design defect argument focuses solely on Dr. Durig's expert report and deposition testimony. *See id.* at pp. 13–18.

8

jack. Durig. Dep. at p. 10. He opined the hollow plastic legs of the pallets "wear[] out very quickly" due to the limited amount of material in them, indicated the pallets could endure more wear if the legs were "solid," and asserted the pallets could incorporate "a red stripe a half-inch up" on the legs to indicate when to stop using a pallet. *Id.* at pp. 39, 41, 48, 76. Dr. Durig also suggested reducing the size of the wheels on the jack, but acknowledged a smaller wheel size could impair the jack's ability to cross uneven surfaces such as door thresholds. *Id.* at pp. 45–47, 80. He opined making the pallets higher "would be the easiest" way to address the clearance issue, *id.* at pp. 40–41, and he asserted raising the pallet legs an inch would "theoretically" make the pallets "more top-heavy, but in the [] real world it's not going to make that big a difference." *Id.* at pp. 42, 44. He also acknowledged making the pallet legs solid would "[t]heoretically" make them more susceptible to cracking. *Id.* at p. 78.

Thus, Dr. Durig proposed several alternative designs: (1) the jack platform could be lower; (2) the pallet legs could be raised; (3) the pallet legs could be made of solid (not hollow) material; and/or (4) the pallet legs could include a red stripe indicating when a pallet should no longer be used.

Plaintiffs have also submitted ***additional*** evidence bearing on the risk-utility analysis. Defendants' engineering expert Roger Davis acknowledged at his deposition that the cost of lengthening the pallet legs by a half-inch would be "[n]ot much, a little bit," Davis Dep. at p. 21, and that the pallets would last longer with longer legs. *Id.* at p. 48. Davis also testified placing a block of wood *underneath* the pallet legs (which would raise the pallet) would be a safe method of removing a jack stuck under a pallet, *id* at p. 38, and Bruce Hailston[9] of Magline testified likewise. *See* Hailston Dep. at p. 31. Additionally, Plaintiffs have presented evidence that newer versions of CooLift pallets have a greater clearance than older pallets (five-eighths or one-inch versus a half-inch),[10] *see* Davis Dep. at p. 35–36,

---

[9] Hailston is a project engineer for Magline and helped design the CooLift. Hailston Dep. at pp. 5, 8.

[10] The parties stipulate that Mr. Hulsizer was using a third-generation pallet on the day of the accident. ECF No. 29 at p. 2. Third-generation pallets have a half-inch of clearance while fourth-generation pallets have a five-eighths or one-inch clearance. *Id.* (citing Hailston Dep. at pp. 35–36).

9

and that Magline now sells adapter legs that increase the length of "worn down" pallet legs.[11] *See* Patterson Dep. at pp. 56–57.

The Court concludes Plaintiffs have presented evidence tending to create genuine issues of material fact on each of the factors relevant to the risk-utility test, by way of not only Dr. Durig's expert opinion *but also* the other evidence summarized above. Dr. Durig did not robotically tick through each of the three risk-utility factors, but his expert report and deposition testimony do present evidence bearing on the safety and functionality factors. His opinion is scant regarding the cost factor, but he did testify a simple red stripe could be added to the pallet legs. *See, e.g.*, *Marshall v. Lowe's Home Centers, LLC*, No. 4:14-cv-04585-RBH, 2016 WL 4208090, at *24 (D.S.C. Aug. 10, 2016) (finding the "[p]laintiff's evidence of costs" was "weak and lacking a specific dollar figure" but was still sufficient to create a genuine issue of material fact regarding the cost factor of the risk-utility test), *disagreed with on other grounds by Hickerson v. Yamaha Motor Corp.*, 882 F.3d 476, 484 (4th Cir. 2018). Regardless, Plaintiffs have addressed cost by submitting the deposition testimony of Defendants' expert Davis, who acknowledged the cost of lengthening the pallet legs is minimal. Moreover, Defendants' witnesses indicated that it is safe to place a block of wood underneath a pallet—which would increase the height of the pallet—and that longer legs would actually increase the life of a pallet. Finally, and most significantly, Magline now sells adapter/extender legs that increase the length of worn-down pallet legs. Viewing this evidence in the light most favorable to Plaintiffs, the Court concludes genuine issues of material fact exist regarding each factor—cost, safety, and functionality—of the risk-utility test.

For purposes of summary judgment, Plaintiffs have satisfied the requirements of *Branham* by

---

[11] Plaintiffs assert this evidence does not constitute subsequent remedial measures (*see generally* Fed. R. Evid. 407) because these modifications were made for other reasons, *see* ECF No. 29 at pp. 2–3 (citing Hailston Dep. at pp. 35–36 and Patterson Dep. at pp. 56–57), and Defendants do not dispute this assertion in their reply.

setting forth some evidence of an alternative design (actually, several designs) for the CooLift and presenting evidence bearing on the three risk-utility factors. "Whether this evidence satisfies the risk-utility test is ultimately a jury question." *Branham*, 701 S.E.2d at 13–14. Accordingly, the Court will deny Defendants' motion for summary judgment as to Plaintiffs' design defect claim brought under strict liability and warranty theories.

### B. Negligence Theory

Plaintiffs also allege Defendants were negligent in designing the CooLift. Compl. at ¶¶ 10–16.

#### 1. Applicable Law

On any negligence claim, including one for products liability, the plaintiff must prove the defendant failed to exercise reasonable care.[12] *Branham*, 701 S.E.2d at 9. Unlike strict liability, the focus in a negligent products liability claim "is on the conduct of the seller or manufacturer, and liability is determined according to fault." *Id.* (quoting *Bragg*, 462 S.E.2d at 326)). When pursuing a products liability claim under a negligent design theory, a plaintiff must establish the three requisite elements of a strict products liability claim listed above[13] *and* the additional element that the manufacturer or supplier failed to exercise reasonable care to adopt a safe design. *5 Star, Inc. v. Ford Motor Co.*, 759 S.E.2d 139, 141 & n.3 (S.C. 2014) (involving a negligent design claim). This additional "burden may be met by showing that the manufacturer was aware of the danger and failed to take reasonable steps to correct it." *Madden*, 328 S.E.2d at 112.

---

[12] In a negligence suit, the plaintiff must establish duty, breach of duty, causation, and damages. *Moore v. Barony House Rest., LLC*, 674 S.E.2d 500, 504 (S.C. Ct. App. 2009) (negligent products liability claim).

[13] Again, those elements are (1) the plaintiff was injured by the product; (2) the injury occurred because the product was in a defective condition that was unreasonably dangerous to the user; and (3) the product, at the time of the accident, was in essentially the same condition as when it left the hands of the defendant. *Rife*, 609 S.E.2d at 568. If a strict liability claim is dismissed and the basis for dismissal rests on a common element shared by a companion negligence claim, the companion negligence claim must also be dismissed. *Branham*, 701 S.E.2d at 9.

11

"When assessing liability in a design defect claim against a manufacturer, the judgment and ultimate decision of the manufacturer must be evaluated based on what was known or reasonably attainable at the time of manufacture." *Branham*, 701 S.E.2d at 17 (internal quotation marks omitted). "[T]he central inquiry is whether there is affirmative conduct in creating a dangerous condition or a failure to perceive a foreseeable risk and take reasonable steps to avert its consequences," *id.* (internal quotation marks omitted), and "the focus may be either on the presence of conduct or the absence of conduct." *5 Star*, 759 S.E.2d at 143.

### 2. Analysis

Defendants first argue Plaintiffs' negligence claim fails for the same reasons their strict liability and warranty claims fail. ECF No. 28-1 at pp. 22–23. Specifically, Defendants contend that because Plaintiffs have not shown the CooLift was in an unreasonably dangerous defective condition, their negligence claim—which shares with the strict liability and warranty claims the common element of showing the product was in a defective condition unreasonably dangerous to the user—likewise fails. *Id.* at p. 22. The Court rejects this argument because, as discussed above, a jury question exists as to whether the CooLift was defectively designed and unreasonably dangerous.

Defendants next argue Plaintiffs have not produced any evidence showing Defendants failed to exercise due care in designing the CooLift. *Id.* The Court disagrees.

Plaintiffs have submitted the following evidence with their response in opposition. Bruce Hailston (a Magline project engineer who helped design the CooLift) testified that he had heard "more than three of four times" about the jack getting stuck under pallets; that he was aware in 2013 that the pallet legs could get worn down; that worn-down pallet legs could cause this sticking; that he would not use force to pull out the jack; and that it was unsafe to remove the jack in the manner that Mr.

12

Hulsizer did. Hailston Dep. at pp. 30–31, 33, 46–48, 51. Alice Patterson (Magline's director of new product development) testified that pallet legs would wear down with normal use; that worn-down legs would cause the jack to get stuck under a pallet; that as its legs shortened, a pallet would become unusable with the jack due to the lack of clearance; that Magline received a customer complaint in August 2014 and concluded the customer was having trouble removing a jack due to worn-down pallet legs; that it would be difficult to operate the CooLift with worn-down pallet legs; and that "[a]nything is possible" if a person jerked the jack from underneath a pallet. Patterson Dep. at pp. 37–38, 41, 51, 58, 63–64, 66, 70. Finally, Defendants' expert Roger Davis testified that it was foreseeable that pallet legs would get worn down in a warehouse environment, and that "it would not be safe trying to manhandle a two hundred pound piece of equipment." Davis. Dep. at pp. 35–36, 38, 40–41.

Viewing the above evidence in the light most favorable to Plaintiffs, there is a genuine issue of material fact regarding whether Defendants exercised due care in designing the CooLift. Specifically, there is evidence suggesting Defendants were "aware of the danger" associated with the CooLift "and failed to take reasonable steps to correct it." *Madden*, 328 S.E.2d at 112. Accordingly, the Court will deny Defendants' motion for summary judgment as to Plaintiffs' design defect claim brought under a theory of negligence.

## II.   Warning Defect Claim

Plaintiffs claim Defendants failed to warn users about the pallet jack's "unsafe propensity to get stuck in the pallets it was designed to carry." Compl. at ¶ 12. Plaintiffs further allege Defendants failed to provide adequate instructions explaining how to prevent the jack from becoming stuck in the pallets. *Id.* at ¶ 9.

Defendants first argue they are entitled to summary judgment on Plaintiffs' warning defect claim

13

because Plaintiffs have failed to establish a reasonable alternative design for the CooLift. *See* ECF No. 28-1 at p. 19. However, as explained above, Plaintiffs have presented sufficient evidence of a reasonable alternative design to withstand summary judgment.

Nevertheless, Defendants are entitled to summary judgment on the warning defect claim for a separate reason argued in their motion—Mr. Hulsizer recognized the danger associated with the CooLift. *See* ECF No. 28-1 at pp. 20–21.

"Suppliers and manufacturers of dangerous products are generally under a duty to warn the ultimate user of the dangers associated with the use of the product." *Lawing v. Univar, USA, Inc.*, 781 S.E.2d 548, 557 (S.C. 2015). "A product may be deemed defective, although faultlessly made, if it is unreasonably dangerous to place the product in the hands of the user without a suitable warning." *Moore*, 674 S.E.2d 500, 503–04. "In order to prevent a product from being unreasonably dangerous, the seller may be required to give a warning on the product concerning its use." *Anderson v. Green Bull, Inc.*, 471 S.E.2d 708, 710 (S.C. Ct. App. 1996). However, "a seller is not required to warn of dangers or potential dangers that are generally known and recognized." *Id.*

During his deposition, Mr. Hulsizer testified that he had previously used the CooLift to make deliveries and had received training on it. A. Hulsizer Dep. at pp. 14–15. He further acknowledged his numerous prior difficulties with the pallet jack getting stuck under pallets:

> Q: Before October 13th of 2014, had you ever had any problems using the Coolift lift?
>
> A: They would get stuck under pallets all the time.
>
> Q: And then how would you - - if that occurred, what would you do?
>
> A: You would have to fight with the machine to get it out from

> > underneath the pallet. . . . There's nothing you could do. Tilt
> > the machine forward and slide it out.
>
> Q: Is that a problem you had every time you used it or just on occasion?
>
> A: Every other pallet.
>
> . . . .
>
> Q: Do you remember if you had had any problems with the CooLift or the pallet before the injury occurred?
>
> A: I mean, I was moving the pallets in the truck to organize my stop so I could get everything off. I mean, it was getting stuck on other pallets, it's just something you deal with on a day-to-day basis.

*Id.* at pp. 16–18; *see also id.* at p. 25 ("It gets stuck all the time."); *id.* at p. 26 ("It was an everyday occurrence when I was on Coolift that pallets would get stuck."). Mr. Hulsizer also testified that he had complained "numerous times" to his supervisor at Pepsi about the CooLift getting stuck; that his supervisor told him "to deal with it"; that he knew other drivers "often carried pieces of wood to stick underneath the pallets to get the Coolift out"; and that those drivers would place the wood underneath the pallet legs. *Id.* at pp. 16, 25.

Based on his testimony, it is clear Mr. Hulsizer recognized the danger associated with the CoolLift, namely that the jack frequently became stuck underneath pallets. Mr. Hulsizer admitted having to "fight" to remove the jack when it was stuck, and he knew other drivers remedied this problem by using wooden blocks. Defendants did not have a duty to warn Mr. Hulsizer of a danger he already understood, *see Anderson*, 471 S.E.2d at 710, and therefore his warning defect claim fails as a matter of law. *See, e.g., Holland*, 754 S.E.2d at 721–22 (citing *Anderson* and affirming the circuit court's grant of summary judgment on a warning defect claim in part because the plaintiff effectively

15

admitted at his deposition that "he appreciated the danger associated with the" product). Accordingly, the Court will grant Defendants' motion for summary judgment as to Plaintiffs' warning defect claim (brought under theories of strict liability, negligence, and breach of warranty).

## III. Punitive Damages

Finally, Defendants move for summary judgment on Plaintiffs' claim for punitive damages, asking the Court to strike it because Plaintiffs have failed to provide any evidence that Defendants' alleged misconduct was willful, wanton, or reckless. ECF No. 28-1 at p. 23. Plaintiffs' response in opposition does not address Defendants' argument.

While punitive damages are recoverable in a products liability action brought under a theory of negligence, *see Scott by McClure v. Fruehauf Corp.*, 396 S.E.2d 354, 357 (S.C. 1990),[14] Plaintiffs have not directed the Court to any facts or argument bearing on the issue of punitive damages. Accordingly, the Court will strike their claim for punitive damages.[15] *See* Fed. R. Civ. P. 56(e) ("If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it[.]").

## Conclusion

For the foregoing reasons, the Court **GRANTS IN PART AND DENIES IN PART**

---

[14] *See also Duncan v. Ford Motor Co.*, 682 S.E.2d 877, 886 (S.C. Ct. App. 2009) ("Under South Carolina law, punitive damages may be awarded to punish tortfeasors who have acted in a reckless, willful, or wanton manner. The plaintiff must prove punitive damages by clear and convincing evidence. Clear and convincing evidence is: that degree of proof which will produce in the mind of the trier of facts a firm belief as to the allegations sought to be established. The clear and convincing standard is the highest burden of proof known to civil law." (internal quotation marks and citations omitted)).

[15] Plaintiffs may file a motion for reconsideration if they disagree with the Court's reading of their response in opposition.

Defendants' motion for summary judgment [ECF No. 28], **DISMISSES** Plaintiffs' warning defect claim *with prejudice*, and **STRIKES** Plaintiffs' claim for punitive damages. **To clarify, Plaintiffs' remaining claims are (1) the <u>design defect</u> claim brought under theories of strict liability, warranty, and negligence, (2) the <u>amalgamation of interests</u> claim, and (3) the <u>loss of consortium</u> claim.**[16]

    **IT IS SO ORDERED.**

Florence, South Carolina　　　　　　　　　　　　　　　　　　s/ R. Bryan Harwell
October 29, 2018　　　　　　　　　　　　　　　　　　　　　　R. Bryan Harwell
　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　United States District Judge

---

[16] Defendants' summary judgment motion does not separately address the amalgamation of interests and loss of consortium claims; rather, Defendants simply argue these claims fail if Plaintiffs' products liability claims fail. *See* ECF No. 28-1 at p. 23. As indicated above, Plaintiffs' design defect claim is going forward, and therefore their amalgamation and consortium claims are proceeding at this time.